COURT OF APPEALS OF VIRGINIA

Present:    Judges Elder, Felton and Senior Judge Willis

HEATHER NICOLE ARTHUR

                                                                    MEMORANDUM OPINION[*]
v.        Record No. 2186-05-3                                           PER CURIAM
                                                                    FEBRUARY 7, 2006
CAMPBELL COUNTY DEPARTMENT OF
 SOCIAL SERVICES


FROM THE CIRCUIT COURT OF CAMPBELL COUNTY
Von L. Piersall, Jr., Judge Designate

(Curtis L. Thornhill; Berger & Thornhill, on brief), for appellant.

(David W. Shreve, County Attorney; George W. Nolley, Guardian
*ad litem* for the infant child, on brief), for appellee.


        Heather Nicole Arthur appeals from the trial court's decision terminating her residual

parental rights to J.A., her minor son, pursuant to Code § 16.1-283(B) and (C).  Arthur contends the

evidence was insufficient to prove it was in the best interest of J.A. to terminate her rights and was

insufficient to prove the neglect or abuse suffered by J.A. presented a serious threat to his life, health

or development.  Arthur also contends she substantially corrected the conditions that led to the

removal of J.A.  Upon reviewing the record and briefs of the parties, we conclude this appeal is

without merit.  Accordingly, we summarily affirm the decision of the trial court.  See Rule 5A:27.

                                        BACKGROUND

        We view the evidence in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax County Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).  So viewed, the evidence

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

proved that Arthur had a troubled childhood and in 1999 she was placed in the care of Campbell County Department of Social Services (DSS) at thirteen years of age as a result of being expelled from school, running away, and using drugs. When Arthur came into the custody of DSS, she had been diagnosed with bipolar disorder, ADHD, and conduct disorder. Arthur received psychiatric, psychological, educational, and therapeutic services while in the care of DSS. In 2001, Arthur was hospitalized for paranoia and delusions. After she was discharged, Arthur returned to her foster home, but a short time later she was charged with grand larceny and placed in a detention home. Due to aggression problems and concerns with her sexual promiscuity, Arthur was again hospitalized. After Arthur was discharged, she resided at a residential treatment center. Arthur ran away from the center and was committed to the Department of Juvenile Justice (DJJ). Upon her release from DJJ in November 2002, Arthur returned to live with her mother, and DSS provided home-based services. On December 12, 2002, Arthur ran away from her mother's house and left a suicide note. Arthur was apprehended by the police and was again hospitalized. On January 10, 2003, Arthur was admitted to another residential treatment center (the Pines) in southeastern Virginia. Arthur ran away from the center on March 19, 2003, and was seen getting into a car in Virginia Beach. A few days later, the police apprehended Arthur in Campbell County and she was again hospitalized. Arthur admitted using drugs while on the run, having sexual intercourse with men to get back to Campbell County, and staying with a man named Randall Moseley for several days. After she was released from the hospital, Arthur returned to the Pines, and in April 2003 she informed her social worker that she was pregnant. Arthur argued with her peers at the Pines, and she thought people were threatening to kill her and her unborn child. Due to her problems at the Pines, Arthur moved to Alpha House, a group home for pregnant teens and teen mothers in Petersburg. While at Alpha House, Arthur attended parenting classes, and received prenatal and counseling services;

however, she failed to follow doctor's orders, failed to take prescribed medication, failed to follow the rules of Alpha House, and was belligerent.

On November 24, 2003, J.A. was born and DSS removed J.A. from Arthur's custody at birth, but permitted him to live with her at Alpha House. The initial foster care service plan was to return J.A. to Arthur. After J.A.'s birth, Arthur was required to complete a psychological evaluation. Dr. Richard Bowers completed the evaluation in February 2004. Dr. Bowers diagnosed Arthur with anti-social personality disorder, and based upon her past behaviors, including her relationships with men, he did not believe Arthur could "turn around." While at Alpha House, Arthur screamed at J.A., carried boiling water while holding J.A., and acted obsessively toward J.A. Alpha House staff were also concerned that Moseley, J.A.'s father, would take J.A. from Alpha House. On February 3, 2004, DSS removed J.A. from Alpha House, and on February 25, 2004, Arthur voluntarily left Alpha House. Arthur's discharge summary from Alpha House recommended that she not be left unattended with any child.

After Arthur left Alpha House, she resided in Campbell County and her social worker referred her case to Comprehensive Family Services (CFS), an agency that provides home-based services to families, parenting services, assistance with visitation, and anger management counseling. CFS also arranged for counseling for Arthur with Jane Neilson at the Alliance for Families and Children. Arthur completed anger management classes, parenting classes, and classes on appropriate behavior during visitation. Arthur was inconsistent with her therapy with Neilson and did not have stable employment. DSS was also concerned with Arthur's relationships with Moseley, and another man, Shawn Jenkins.

Dr. William Whelan, a clinical psychologist and co-director of a Child-Parent Attachment Clinic, evaluated Arthur and J.A. when J.A. was five months old. Dr. Whelan was concerned with Arthur's history of running away, her history of high risk self-soothing

behaviors, and her difficulty in participating in treatment regimens. In Dr. Whelan's opinion, Arthur would not be able to meet J.A.'s needs. On November 8, 2004, Dr. James Anderson, a clinical psychologist, evaluated Arthur. Dr. Anderson found that Arthur had a narcissistic and histrionic personality makeup. Dr. Anderson was concerned that Arthur would be unable to put the needs and feelings of a child ahead of her own desires for attention and affection and that Arthur was unable to protect herself and her child from negative and destructive relationships. Dr. Anderson found that Arthur needed continued mental health counseling, help with practical aspects of independent living, and help with managing a household.

On November 19, 2004, Michelle Smith, a CASA Volunteer, was at Arthur's home during a visitation with J.A. J.A. was approximately one year old and beginning to walk. Smith noticed candles burning in the home, and Smith asked Arthur about the candles. Arthur stated she knew the candles were burning, but J.A. knew the candles were hot and he would not touch them.

On November 22, 2004, DSS changed the goal for J.A. to adoption. At approximately the same time, Arthur confirmed to her social worker that she was pregnant and Jenkins was the father. Later, DSS learned that Jenkins assaulted Arthur while she was pregnant. Arthur's second child was born in May 2005. After Arthur's second child was born, the police responded to an altercation at Jenkins' home. Arthur and Jenkins filed cross-warrants against each other, which were taken under advisement for one year and the court ordered Arthur to be on good behavior. Approximately one week prior to the termination hearing, Arthur went to Jenkins' house during the early morning hours to try to build a relationship with him and they had sexual relations; however, later they had a physical altercation and the police responded. Arthur's second child was present during this altercation. Arthur was not employed at the time of the termination hearing, and she admitted she had been terminated from her job at Wal-Mart for

failing to show up for work. Arthur had not obtained her GED at the time of the termination hearing.

Susan Shutt, a case manager for the teen parenting program at the Alliance for Families and Children, met Arthur in October 2004 when she was pregnant with her second child. Shutt testified Arthur left the program in February 2005.

Lisa Garwacke, a mentor with the CFS, worked with Arthur from August 2004 through December 2004. Garwacke assisted Arthur with visitations with J.A. and testified Arthur was responsive to her assistance. Garwacke testified she talked with Arthur about healthy relationships with men. Garwacke admitted she was not aware Arthur was involved with domestic altercations with Jenkins on October 30, 2004 and November 28, 2004.

Rachael Kreh, an employee of Central Virginia Community Services, worked with Arthur in a parenting program in March 2005. Kreh had four one-hour home visits with Arthur. Kreh testified she did not notice any problems or concerns with Arthur. Kreh admitted Arthur revoked her permission allowing Kreh to speak to DSS about Arthur's case. Kreh admitted she had insufficient information to form an opinion regarding Arthur's suitability to parent J.A.

## ANALYSIS

Code § 16.1-283(B) requires proof, by clear and convincing evidence that "[t]he neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development" and "[i]t is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time."

Code § 16.1-283(C)(2) requires proof, by clear and convincing evidence that (a) the termination is in the best interests of the child, (b) "reasonable and appropriate" services have been offered to help the parent "remedy substantially the conditions which led to or required

continuation of the child's foster care placement," and, (c) despite those services, the parent has failed, "without good cause," to remedy those conditions "within a reasonable amount of time not to exceed twelve months from the date the child was placed in foster care."

"The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal, unless plainly wrong or without evidence to support it.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citation omitted).

In this case, clear and convincing evidence proved the neglect or abuse suffered by J.A. presented a serious threat to his life, health or development, Arthur failed to remedy the conditions that led to the placement of J.A. into foster care, and it was in J.A.'s best interest to terminate Arthur's residual parental rights.

From the age of thirteen, Arthur received numerous inpatient and outpatient rehabilitative services. Arthur resided in three residential treatment facilities, but she failed to follow the rules of the facilities and ran away from two of the facilities. Arthur's discharge summary from the last residential facility recommended that she not be left alone with any child. While she was in the custody of DSS, Arthur was hospitalized several times at an adolescent psychiatric center. Arthur was diagnosed with a narcissistic and histrionic personality makeup. Based upon Arthur's history of running away, her history of high risk self-soothing behaviors, and her difficulty in participating in treatment regimens, Dr. Whelan did not believe Arthur would be able to meet J.A.'s needs. Due to Arthur's personality makeup, Dr. Anderson did not believe Arthur would be able to put the needs and feelings of a child ahead of her own desires for attention and affection. Dr. Anderson also did not believe Arthur would be able to protect herself and her child from negative and destructive relationships. Based upon her past behaviors, including her relationships with men, Dr. Bowers did not believe Arthur could "turn around." When Arthur was pregnant with her second child, she admitted Jenkins, the father of the child,

hit her. As the result of a domestic disturbance with Jenkins, Arthur was required to be on good behavior. One week prior to the termination hearing, Arthur took her second child to Jenkins' home in the early morning hours, and had sexual relations with him; however, later they had a physical altercation and the police responded. Despite counseling and therapy, Arthur continued to put her own safety and the safety of a child at risk, which was consistent with the opinions of Drs. Whelan, Anderson, and Bowers. Arthur's conduct spanned J.A.'s entire life, despite the best efforts and substantial resources of DSS to assist and redirect Arthur in her behavior and parenting skills. "The [termination] statute clearly contemplates that efforts to resolve the 'conditions' relevant to termination are constrained by time." Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995) (citation omitted). "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax County Dep't of Soc. Serv., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

The record supports the trial court's finding that DSS presented clear and convincing evidence satisfying the statutory requirements of Code § 16.1-283(B) and (C)(2) and establishing that the termination of appellant's residual parental rights was in J.A.'s best interest.

Accordingly, we summarily affirm the decision of the trial court. See Rule 5A:27.

Affirmed.